## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No: 21-cr-152-TSC** |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **JOSHUA R. LOLLAR** | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joshua R. Lollar to 46 months in custody, 36 months of supervised release, restitution of $2,000, and a mandatory assessment of $100. The recommended 46-month sentence is the midpoint of the 41-51month guidelines range, as calculated by both the government and the U.S. Probation Office.

### I.     INTRODUCTION

The defendant, Joshua Lollar, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

On January 6, 2021, Lollar, an Army veteran from Texas, arrived at the U.S. Capitol wearing gloves and body armor and carrying a gas mask. He, along with other rioters, stormed the U.S.

---

[1] As of October 17, 2022, the approximate losses suffered because of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Capitol building from the east entrance and remained inside the building for approximately 25 minutes from 2:55 p.m. until roughly 3:20 p.m.  During his time inside the U.S. Capitol, Lollar participated in multiple physical confrontations with police, putting himself in the front flanks of rioters forcibly resisting police efforts to clear the Rotunda.  Despite being pushed back by police multiple times and ultimately being pepper-sprayed, Lollar repeatedly returned to the front line of rioters to engage with police.  During one of his confrontations, Lollar shoved the arm of an officer away and then used his own arm to push against riot shields to repulse officers who were advancing toward him.  He repeatedly advanced and heaved his armor-clad chest against officers' shields. Lollar's recordings of these activities, which he posted to social media, demonstrated how proud he was to have attacked the Capitol.  He gleefully posted, "it's about to get spicy boi," and "just got gassed and fought with the cops."  His social media posts also demonstrate that Lollar was keenly aware of the mob's collective mission—to "shut the vote down" by disrupting the certification of the of the 2020 electoral college vote.  He recorded a video of himself extolling the efforts of "all these patriots at the Capitol," saying "they got inside and shut the vote down" and "we're on the Capitol steps in back, other patriots in front, they shut down the vote."

The government recommends that the Court sentence Lollar to 46 months' incarceration, which is at the midpoint of the advisory Guidelines' range of 41-51 months, which the government submits is the correct Guidelines calculation.  A 46-month sentence reflects the gravity of Lollar's conduct and the need for both specific and general deterrence.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the Court to the Complaint and Statement of Facts filed in this case, ECF 1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S.

Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, No. 21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Statement of Judge Chutkan).

**B.      Lollar's Role in the January 6, 2021, Attack on the Capitol**

On January 4, Lollar left his home in Spring, Texas, and traveled alone by car to a hotel in Arlington, Virginia. Lollar, an Army veteran, brought with him, among other items, a backpack, gloves, a gas mask, a tan body armor vest, and an AR-15 semi-automatic rifle, along with his concealed carry permit. As he was enroute, Lollar texted one of his friends/family members, "I'm about to head to D.C. We are going to try and save the country." He later texted another, "God has called me here for something. I think this is a start to something much bigger." On January 6, he attended a rally for then-President Trump at the Ellipse. After the rally concluded, Lollar told authorities that he followed the crowd to the U.S. Capitol grounds. Once he reached the Capitol, Lollar, prepared for violence, donned a gas mask, body armor and gloves, and followed the crowd past multiple downed barricades (many of which still contained signs that clearly indicated further entry was prohibited) to the East Front of the Capitol Building. At approximately 2:55 p.m., Lollar and a mob of others, undeterred by the presence of broken glass, alarms, smoke, and police clad in riot gear, entered the Capitol and headed directly to the Rotunda with the purpose of disrupting then-Vice President Pence's certification of the 2020 election. Lollar proudly bragged of his escapades inside the U.S. Capitol.

As set forth in the exhibits below, Lollar reached the Rotunda where others and he repeatedly engaged in physical confrontations with a line of law enforcement officers in full riot gear who were attempting to keep the crowd of rioters from further penetrating the U.S. Capitol building. At approximately 3:05 p.m., Lollar was pepper-sprayed by officers, but he continued to physically

engage with officers.  Lollar even took time to proudly post to his social media followers, "Yeah, I'm good.  Just got gassed and fought the cops that I never thought would happen."  Later, as the officers were trying to clear Lollar and others from the Rotunda, Lollar remained on the front line of a group of rioters who stubbornly refused law enforcement commands to leave.  On several occasions, Lollar physically engaged with multiple federal law enforcement officers, using his arms and his torso to repel efforts to eject him from the Rotunda.  Lollar reacted to an officer's attempt to remove his gas mask by shoving the officer's arm away.  As one officer (identified as "C.D.") advanced against Lollar and other rioters with his riot shield, Lollar, who was at the front of a group of rioters, used his torso and arms to physically engage with Officer C.D. and push back against his riot shield.

Exhibit A is an excerpt of video footage taken by "Town Hall Media" that was later posted on Twitter.  Exhibit B is an excerpt of body worn camera ("BWC") footage from Officer C.D.  Exhibits C is a clip of CCTV footage inside the Rotunda.  In the screenshots taken from these videos, Lollar is circled in red, and he can be seen wearing a red baseball cap, a gas mask, a tan body armor vest, a red and black checkered jacket, and black gloves.  The chronology of Lollar's confrontations as documented by video follows.

### 1.   At 3:05 p.m., Lollar is in the Vanguard of Rioters Trying to Disrupt Law Enforcement Efforts to Clear the Rotunda

At about 3:04 p.m., officers gathered on the west side of the Rotunda, preparing to move rioters out of the Rotunda. Lollar positioned himself at the front of the rioters, face-to-face with the officers.



*1-Screenshot from Exhibit C at 0:20*

Lollar refused to move as the officers stepped forward and instead leaned into the police, using his weight to resist.  Exhibit C shows that at about 3:05 p.m., one of Lollar's fellow rioters attacked an officer and was pepper sprayed by a second officer.  As the officer sprayed Lollar's fellow rioter, Lollar took a step toward the officer and was pepper sprayed as well.



*2-Screenshot from Exhibit C at 0:40*

Lollar stepped back and donned his gas mask, which protected him from being sprayed as police trying to clear the Rotunda used pepper spray again against Lollar.   Instead of retreating or exiting the Rotunda, Lollar continued to confront officers.



*3-Screenshot from Exhibit C at 0:45*

At about 3:06 p.m., Lollar took out his phone, presumably to keep his social media followers abreast of his activities inside the Capitol.



*4-Screenshot from Exhibit C at 0:48*

At about 3:08 p.m., as the line of officers began to advance against the rioters, video footage of Lollar shows him moving to close a gap in the line of rioters where he again proceeded to use his body to prevent police from advancing against the crowd.



*5-Screenshot from Exhibit C at 2:46*

As shown in the following screenshots, in the space of roughly 15 seconds, Lollar, while filming the melee on his phone, managed to surge forward into the face of the advancing officers at least three times.



*6-Screenshot from Exhibit C at 2:55*



***7-Screenshot from Exhibit C at 3:00***



***8-Screenshot from Exhibit C at 3:08***

As depicted in the next screenshot, at approximately 3:10 p.m. when officers were nearing completion of the sweep of those rioters still remaining in the Rotunda, Lollar lunged forward again, throwing his full body weight against the riot shield of Officer C.D. in a futile attempt to avoid being expelled from the Rotunda



*9-Screenshot from Exhibit C at 4:49*

### 2. Between 3:10 p.m. and 3:11 p.m. Lollar Continued to Physically Confront Officers as They Near Completion of Their Efforts to Clear the Rotunda

At approximately 3:10, as police were successfully repelling the rioters and ordering them to leave the Rotunda, Lollar stubbornly refused to obey and instead lunged himself towards the line of police riot shields as officers could be heard shouting "get back, get back."



*10-Screenshot from Exhibit B at 0:07*

Body camera footage from Officer C.D. shows Lollar pushing against C.D.'s riot shield with his left arm.



***11-Screenshot from Exhibit B at 0:19***

A few seconds later, Lollar again stepped toward the officer's shield where he was pushed back by police.  He advanced and threw his bulk at the riot shield, his stomach (clad in his body armor vest) making physical contact with the officer's shield.



***12-Screenshot from Exhibit B at 0:28***

As seen below, Lollar used his gloved hand to shove the officer's shield away.



**13-Screenshot from Exhibit B at 0:33**

Seconds later, as seen below, after an officer attempted to remove his gas mask, Lollar pushed the officer and then the officer's arm away.



**14-Screenshot from Exhibit B at 0:3**

Lollar continued to resist efforts to remove him from the Rotunda.  Instead, he advanced toward an officer's shield, lowering the hand in which he held the phone he used to livestream the melee, and threw his body-armor-clad stomach against the shield.



**15-Screenshot from Exhibit B at 0:44**

He continued to push back against the Officer C.D.'s riot shield with his forearm.



**16-Screenshot from Exhibit B at 0:46**

### b. Town Hall Media Video

Exhibit A, a video clip from a Town Hall Media video that was published on Twitter, is not time-stamped. Nevertheless, it depicts the same interaction described above from a different vantage point.

At approximately 32 through 34 seconds into the clip, depicted in screenshots below, Lollar affirmatively shoved his hand into the officer's shield.  Exhibit B from the BWC is a different vantage point showing the same occurrence at 15:10:07.



**17-Screenshot from Exhibit A at 0:32**



**18-Screenshot from Exhibit A at 0:34**

At approximately 41 to 46 seconds into the clip, as seen below, Lollar shoved his hand into the officer's shoulder and then into another officer's shield.



**19-Screenshot from Exhibit A at 0:41**



**20-Screenshot from Exhibit A at 0:46**

Lollar eventually left the Rotunda at approximately 3:12 p.m., raising his gas mask above his head in victory to celebrate his efforts.



**21-Screenshot from CCTV at 3:12:31**

Lollar ultimately exited the U.S. Capitol Building at approximately 3:20 p.m.

### Lollar's Statements

Lollar used his cell phone on several occasions, both outside and inside the U.S. Capitol Building, to take photographs and make video and audio recordings of his activities on January 6.  On January 6-7, 2021, Lollar made multiple posts to his Facebook account which depicted the events of January 6.  In some of his posts, Lollar included his photographs and live-streamed video, accompanied by his personal audio and written commentary of the events that transpired at the U.S. Capitol on January 6.  Lollar posted images as he entered the U.S. Capitol Building, which he captioned with the words "Busting in."  He later posted, "it's about to get spicey boi!"  In response to being pepper strayed by police, Lollar updated his social media followers: "Just got gassed and fought with cops that I never thought would happen."  In a video taken outside the Capitol, Lollar praised "all these patriots at the Capitol," saying "they got inside and shut the vote down" and "we're on the Capitol steps in back, other patriots in front, they shut down the vote."

On January 7, following his return to Houston, after a family member's Facebook message to him urged him to "clean off your [Facebook] page," Lollar reluctantly agreed and replied, "Okay, I'm going to take it off but so many people are following it now?"

## III.   THE CHARGES AND PLEA AGREEMENT

Lollar was arrested by complaint in Houston on January 15, 2021.  On November 10, 2021, a federal grand jury returned a superseding indictment charging Lollar with the following seven criminal counts: 18 U.S.C. §§ 111(a)(1), 231, 1512(c), 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  Lollar signed a written plea agreement in which he agreed to enter a guilty plea to violating 18 U.S.C. § 1512(c).  On December 19, 2022, Lollar notified the Court at a virtual hearing of his intention to plead guilty, and the Court ordered the preparation of a Pre-Sentence Investigation Report ("PSR").  *See* PSR at ¶ 7.  He is expected to enter his guilty plea at a combined change of plea and sentencing hearing on March 14, 2023.

As noted below, the plea agreement contains certain agreed-upon Guidelines calculations.  However, the issue of whether the eight-level adjustment for causing or threatening physical injury pursuant to U.S.S.G. § 2J1.2(b)(1)(B) applies has been left open.

## IV.   STATUTORY PENALTIES

Lollar will face sentencing on a single count of violating 18 U.S.C. § 1512(c).  As noted in the plea agreement and the PSR, the defendant faces a maximum penalty of 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Lollar's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2J1.2) | 14 |
| Causing or threatening physical injury (U.S.S.G. § 2J1.2(b)(1)(B)) | +8 |
| Substantial interference w/ administration of justice (U.S.S.G. § 2J1.2(b)(2)) | +3 |
| Acceptance of responsibility (U.S.S.G. § 3E1.1) | <u>-3</u> |
| Total adjusted offense level: | 22 |

*See* PSR at ¶¶ 28-39.

The government agrees with the U.S. Probation Office's recommendation that an eight-level upward adjustment applies for causing or threatening physical injury pursuant to U.S.S.G. § 2J1.2(b)(1)(B).   PSR at ¶ 30.   The PSR concludes that Lollar's conduct:

> involved causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice, to wit: The offense involved physical contact, the defendant joined a group of rioters who were resisting the police, intentionally lending his weight and strength to the effort to break through the police line.

While Lollar did not agree to this adjustment in his plea agreement, the eight-level upward adjustment certainly applies to his offense conduct as it involved the administration of justice within the meaning of U.S.S.G. § 2J1.2(b)(1)(B), and his conduct, in fact, threatened to cause physical injury to the numerous law enforcement officers assembled to clear the Rotunda of rioters.

**A.  Lollar's Conduct Threatened Physical Injury Within the Meaning of § 2J1.2(b)(1)(B).**

Lollar's offense conduct in the Rotunda warrants the application of the eight-level upward adjustment in Section 2J1.2(b)(1)(B) because he, along with the throng of rioters accompanying him, threatened physical injury to the law enforcement officers who were attempting to restore order in the Capitol building.  Before entering the Rotunda, Lollar prepared himself to engage in physical conflict by donning his gloves and body armor and hanging his gas mask around his neck.  Lollar is a U.S.

Army veteran who knew that these items served no purpose other than to enable him to take on the law enforcement officers he knew were defending the Capitol.

Lollar passed barricades either laying on the ground or pushed aside, but with visible signage still attached indicating that entry to the U.S. Capitol area was prohibited.  He entered the Capitol in a scene of chaos with broken glass strewn across the floor, smoke, shouts, and blaring alarms.  Once inside the Rotunda, Lollar saw law enforcement officers clad in full riot gear making concerted efforts to oust the rioters from the Rotunda.  He saw them executing sweeps across the floor of the Rotunda to try to remove the rioters and heard shouted verbal commands directing the rioters to exit.  Rather than obey their instructions (or simply stand aside), Lollar instead repeatedly threw himself at the line of officers and their riot shields using his body weight and strength to affirmatively resist the officers and stubbornly push back against their efforts to remove other rioters and him.  Lollar's conduct created a direct risk of physical injury not only to the officers occupied with trying to eject him, but also to other law enforcement personnel.  Officers who were busy contending with Lollar were unable to render assistance to fellow officers who Lollar knew were being attacked by other rioters at the same time.

Lollar physically engaged with riot police not just once, but over and over again.  As video and CCTV footage clearly demonstrates, Lollar returned to the front line to confront the officers on multiple occasions.  Despite repeatedly being pushed back, Lollar again and again threw himself back into the fray to physically push against the line of officers.  Lollar used his arms to shove against an officer's torso.  He pushed an officer's arm aside when the officer attempted to remove the gas mask from Lollar's face.  As officers advanced against the line of rioters with their shields, Lollar used his bulk and arms to push back and resist law enforcement's efforts to break up the crowd of rioters in the Rotunda.  At approximately 3:05 pm, footage shows that Lollar was sprayed with what appears to be oleoresin capsicum (OC or pepper) spray.  Lollar, protected from the effects of the pepper spray by his gas mask, continued to engage with officers for several minutes more.  Lollar stubbornly resisted

law enforcement's efforts to eject him, remained inside the Rotunda until approximately 3:12p.m., and did not exit the Capitol Building itself until approximately 3:20 p.m.

In short, Lollar's individual conduct and his role in assisting the rioters around him posed a serious threat of physical injury to the officers trying to clear the Rotunda.  Other courts in the district have still applied the eight-level upward adjustment in cases where there was no conviction for assault.  *United States v. Anthony Williams*, 21-cr-377 (BAH), is illustrative.  In that case, Chief Judge Howell sentenced Williams to 60 months, after he pleaded guilty to various offenses, including 18 U.S.C. § 1512(c).  Like Lollar, Williams resisted law enforcement attempts to push the mob out of the Capitol. ECF No. 120 at 2.  Though Williams never affirmatively swung at or caused physical injury to any officers, he still received the eight-level enhancement under § 2J1.2(b)(1)(B).  Like Lollar, Williams' conduct posed the threat of physical injury and endangered officers by placing them at risk of being injured by other rioters while their attention was focused on Williams.  Williams, like Lollar also stubbornly resisted officer's attempts to remove him from the Rotunda and was one of the last people to leave the Rotunda.  *Id.* at 21-23.  Other cases in the district where Courts have also applied the eight-level enhancement in cases that did not involve a conviction for assault include: *United States. v. Matthew Bledsoe*, 21-cr-204 (BAH); *United States v. Joshua Pruitt*, 21-cr-23 (TJK); *United States v. Dustin Thompson*, 21-cr-161 (RBW); *United States v. Joshua Hughes*, 21-cr-106 (TJK); *United States v. George Tenney*, 21-cr-640 (TFH); *United States v. Jacob Chansley*, 21-cr-003 (RCL); *United States v. Guy Reffitt*, 21-cr-032 (DLF); *United States v. Thomas Robertson*, 21-cr-034 (CRC); 21-cr-073 (BAH); *United States v. Nicholas Ochs*, 21-cr-073 (BAH); *United States v. Jerod Hughs*, 21-cr-106 (TJK); *United States v. Erik Herrera*, 21-cr-619 (BAH).

The U.S. Probation Office calculated Lollar's criminal history as a category I, which is not disputed by the Government or the defendant.  PSR at ¶ 43.  Accordingly, the U.S. Probation Office calculated Lollar's total adjusted offense level, after acceptance, at 22, and his corresponding Guidelines imprisonment range at 41-51 months.  PSR at ¶ 81.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  The Section 3553(a) factors detailed below weigh in favor of a lengthy term of incarceration for Lollar.

### A.     Nature and Circumstances of the Offense

Lollar's felonious conduct on January 6, 2021, as illustrated above, was part of a massive riot that nearly succeeded in preventing the certification vote from being carried out.  Failure to complete the certification would have frustrated the peaceful transition of Presidential power and likely thrown the United States into a Constitutional crisis.  The nature and circumstances of Lollar's offense conduct are quite serious and fully warrant the government's recommended sentence of 46 months' incarceration.

### B.  The History and Characteristics of the Defendant

The defendant is a 41-year-old U.S. Army veteran.  Notwithstanding Lollar's veteran status, it is important to note that Lollar's crimes on January 6th were certainly not an isolated event in an otherwise law-abiding life.  Although they do not impact his criminal history for sentencing purposes, they do show a history of disrespect for the law.  These offenses include a 2012 arrest for violating a court order of protection in 2012, PSR ¶ 48; a 2014 arrest for resisting arrest (later reduced to a conviction for refusing a breathalyzer), PSR ¶ 41; a 2015 arrest (later dismissed) for unauthorized use of a vehicle, PSR ¶ 42; and a 2017 conviction for making a false statement on a vehicle application. PSR ¶ 49.

To date, Lollar's general disrespect for the law persists.  When he was initially arrested in connection with the instant charges, Lollar refused to disclose to Pretrial Services in Houston the number, location and type of firearms and other weapons he had stored at his parents' house.  It was Lollar's father who eventually intervened and agreed to remove the weapons from the household. Lollar has also persistently failed to comply with his conditions of release.  PSR at ¶ 11.  He has repeatedly refused to obtain court-ordered mental health treatment or be candid with the Court about

his compliance in obtaining required treatment.  *See* ECF 26, dated February 10, 2022. ECF 30, dated

March 31, 2022 ("USPO Vaults is still not getting information that the defendant is receiving

treatment.").  To date, he has failed to execute a release of medical information and forms deemed

necessary to monitor his compliance with court-ordered mental health treatment.  Failure to execute

those forms is a direct violation of the conditions of his pretrial release.  Lollar's supervising officer

in the Southern District of Texas reported Lollar's refusal to participate in mental health counseling to

the Court on January 6, 2023.

Lollar has also refused to execute other releases necessary to ensure the accuracy of the PSR.

There are at least four documented instances, to date, of failures on Lollar's part to provide forms that

are necessary to obtaining information to verify various aspects of his background that were reported

in the PSR.  These include releases for medical records, financial information, and records of his

military service. *See* ECF 47 at ¶¶ 59, 61, 69 and 77. In addition, the Government's Sealed

Opposition to Lollar's Motion to Modify Conditions of Release documents additional violations of

his conditions of release.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack

on the rule of law. "The violence and destruction of property at the U.S. Capitol on January

6 showed a blatant and appalling disregard for our institutions of government and the

orderly administration of the democratic process." *See* Federal Bureau of Investigation Director

Christopher Wray, Statement before the House Oversight and Reform Committee (June 15,

2021) (hereinafter "FBI Director Wray's Statement"), available at

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

As with the nature and circumstances of the offense, this  factor  supports  the

recommended  sentence  of  incarceration.  Lollar's  criminal  conduct  in  corruptly obstructing of

an official proceeding, and bragging about, is the epitome of disrespect for the law.  Lollar illegally

entered the Capitol wearing tactical gear and prepared for combat.  When he reached the Rotunda

with other rioters, it was abundantly clear to him that law enforcement officers, clad in riot gear,

were actively attempting to eject the rioters from the Rotunda area.  Instead of obeying law

enforcement instructions to vacate the area as others did, Lollar chose to remain behind for nearly

half an hour during which time he repeatedly physically engaged with law enforcement, thus

placing numerous officers in physical danger of injury from other rioters.  In sum, the rule of law

was not only disrespected; it was under attack that day.  A lesser sentence would suggest to the

public, in general, and other rioters, specifically, that attempts to obstruct official proceedings are

not taken seriously. In this way, a lesser sentence could encourage further abuses.  *See Gall*, 552

U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to

promote disrespect for the law").

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### 1.  General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.  The demands of general

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of

the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to

interfere, and did interfere, with one of the most important democratic processes we have: the

peaceful transfer of power.  As noted by Judge Moss during sentencing, in *United States v. Paul

Hodgkins*, 21-cr-188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that [the
> defendant] and others caused that day goes way beyond the several-hour delay in the

certification. It is a damage that will persist in this country for decades. Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.").  And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

### 2.    Specific Deterrence

The need for the sentence to provide specific deterrence for Lollar also weighs heavily in favor of a 46-month term of incarceration for several reasons.  First, his history of arrests and convictions shows a clear pattern of violating the law.  Second, although Lollar eventually accepted personal responsibility for his role in the January 6 riots, it took nearly two years and did not occur until the government was well into trial preparation and only after government counsel offered a reverse proffer to Lollar and his attorney.  Third, Lollar showed up at the Capitol on January 6 clad in body armor and wearing a gas mask.  This fact, coupled with his statements to others and on social media before, during, and after the events of January 6, demonstrate that he came to D.C. ready for conflict and intending, in his words, to "shut down the vote."  Lollar's history of assault and rhetoric, the lack of respect for the law, his failure to cooperate with his pre-trial conditions of release and his delay in accepting responsibility for his actions coupled with his own statements following the events of January 6 all demonstrate that Lollar's sentence must be sufficient to provide specific deterrence from committing future crimes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).  As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).  "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).  In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.  As this Court knows, the

government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines continue to be powerful driver of consistency and fairness.

###### F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (Statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own

set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[2]

Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 21-cr-54 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Statement of Judge Chutkan). Of the hundreds of people illegally breached the U.S. Capitol on January 6, 2021, many of these individuals were mere spectators; they didn't deface or steal U.S. Government or personal property and left them building when ordered by police. Their sentences have reflected the fact that

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

they did little more than trespass.  Others, like Lollar, chose to physically engage with law enforcement and defy lawful instructions to vacate the Capitol.

The defendants discussed below all participated in the Capitol breach on January 6, 2021, and like Lollar, chose to defy law enforcement and remain inside the Capitol building where they resisted law enforcement efforts to remove them.  There are many salient differences, however, to explain the differing recommendations and sentences.  While no previously sentenced case contains the exact same balance of aggravating and mitigating factors present in Lollar's case, the sentences in the following cases provide suitable comparisons for relevant sentencing considerations in Lollar's case.

An analogous case is *United States v. Anthony Robert Williams*, No. 21-cr-377 (BAH). Williams entered the grounds on the west side of the Capitol, scaled a small wall and purloined bike rack fencing and entered through the Senate Wing Door.  (ECF No. 120 at 2).  Like Lollar, he posted on social media before and after the riot. *Id*.  He was convicted at trial of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §1512(c)(2) and Chief Judge Howell sentenced Williams to 60 months, after he pleaded guilty to various offenses, including 18 U.S.C. § 1512(c).  Like Lollar, Williams also resisted law enforcement attempts to push the mob out of the Capitol.  *Id*.  Despite never having affirmatively swung at or causing injury to an officer, Williams still received the eight-level enhancement under § 2J1.2(b)(1)(B), because, like Lollar, his conduct endangered officers.  Finally, like Lollar who was among the last wave of exiting rioters, Williams was also one of the last people to leave the Rotunda.  *Id* at 21-23.

Thomas Robertson, *United States v. Thomas Robertson*, No. 21-cr-34 (CRC), a Rocky Mountain, Virginia police officer, attempted to block Metropolitan Police from crossing the west lawn by holding a wooden stick across his chest in a tactical stance.  ECF No. 124 at 5. He was in the first wave of rioters to ascend the Northwest stairs to the Upper West Terrance and to enter the Capitol through the Senate Wing door.  Robertson was part of the crowd in the Crypt who overran the line of United States Capitol Police officers attempting to block rioters from pushing further into the

building. *Id.* at 7.  Robertson advocated on social media for the use of violence to overturn the election results.  *Id.* at 4.  Following the riot, he bragged about his conduct on social media.  *Id*. at 8-9.  Following a guilty verdict at trial, Robertson (facing a Guidelines range of 87 to 108 months) was sentenced to 87 months' imprisonment.  Like Lollar, Robertson had direct confrontations with police and refused to comply with orders to vacate the Capitol.  Robertson also violated the conditions of his release by purchasing firearms, *Id.* at 10-11, whereas Lollar refused to disclose to pre-trial services the type, location and number of firearms and weapons still in his possession.   However, Robertson's actions were far more serious than Lollar's which accounts for the harsher sentencing.  Unlike Lollar, Robertson entered the Capitol grounds carrying a dangerous weapon.  He was in the first wave of rioters to enter the Capitol and participated in overrunning the line of United States Capitol Police officers attempting to block rioters from pushing further into the building.

Jacob Chansley, *United States v. Jacob Chansley*, No. 21-cr-3, (RCL), also illegally entered the Capitol.  Chansley also carried a weapon (a spear), but never physically engaged with police.  ECF. No. 81 at 5.  Unlike Lollar, Chansley made it to the Senate floor and left a threatening note for then-Vice President Mike Pence on the Senate dais.  *Id.* at 10.  Following the riot, Chansley gave interviews to media outlets where – like Lollar's expressions of pride on social media after the riot – Chansley gloated and said he considered January 6th "a win."  *Id.* at 12.  Chansley (facing a Guidelines range of 41 to 51 months) was sentenced to 41 months' imprisonment after the government recommended 51 months. Chansley's case is different from the Lollar's in that Chansley accepted responsibility at a relatively early stage in his criminal proceedings by pleading guilty to violating § 1512(c)(2).  *Id.* at 20.   Lollar did not accept responsibility for his actions until nearly two years after the events of January 6.

In *United States v. Erik Herrera*, No. 21-cr-619 (BAH), Chief Judge Howell sentenced Herrera to 48 months, after he pleaded guilty to several offenses, including 18 U.S.C. § 1512(c).  Herrera, a self-proclaimed photojournalist, entered the Capitol through the Senate Parliamentarian

Door/Senate Fire Door.  ECF No. 75 at 2.  He went into the Senate Parliamentarian's Office where he took some photos, including one of himself holding a stack of papers from that office, and then threw those papers in the air and stole a bottle of alcohol.  *Id.* at 2-3.  He left the Office after getting kicked out by police.  *Id.* at 13.  Herrera then re-entered the Capitol building a second time, this time through the Senate Wing Door.  *Id.*  He entered the nearby office of a Senator, where he smoked marijuana.  *Id.* at 14.  Herrera eventually made his way to the Crypt and the Memorial Doors, where he finally left after spending just over 30 minutes inside the Capitol.  In several respects, Herrera's conduct is less serious than Lollar's.  Unlike Lollar, there is no indication that Herrera had any physical confrontations with law enforcement.  Nor did he wear any type of protective gear.  Although Lollar's footprint was smaller and he did not enter more sensitive areas, he remained in the building for about the same duration.  As noted, although Lollar did not throw papers, smoke weed, or steal alcohol, he repeatedly physically confronted law enforcement officers.

Considering the above sentences, imposing the government's recommended 46-month sentence would be in line with these sentences and would minimize unwarranted sentencing disparities**.**

### VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."  *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).  At the same time, the VWPA also authorizes a court to impose

restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Lollar must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Lollar played in the riot on January 6.  Plea Agreement at ¶ 10.  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id*.  Lollar's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶¶ 84.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 46 months' incarceration, 3 years' supervised release, restitution in the amount of $2000, and a special assessment of $100.

Respectfully submitted,

Matthew M. Graves
United States Attorney

By:      */s/ Steven Ward*
Steven Ward
Trial Attorney
U.S. Department of Justice

Mona Sedky
Special Assistant United States Attorney